# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**KEVIN A. TOLLIVER,**

    Plaintiff,

  v.                                     Civil Action 2:16-cv-1020
                                            Judge George C. Smith
                                            Magistrate Judge Jolson

**WARDEN NOBLE,**

    Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Kevin Tolliver's Motion for Preliminary Injunction and Temporary Restraining Order (Doc. 34) is before the Court. For the reasons that follow, it is **RECOMMENDED** that the Motion be **DENIED**. Defendant is **DIRECTED** to respond to Plaintiff's Offer of Settlement (Doc. 59) within 14 days of the date of this Report and Recommendation. Defendant may file a notice with the Court indicating compliance with this directive but need not file the response on the public docket.

## I. BACKGROUND

Plaintiff, an inmate at Pickaway Correctional Institution ("PCI"), seeks injunctive relief from this Court in order to, in Plaintiff's words, "protect" his ability to litigate. (Doc. 34 at 1). More precisely, Plaintiff asks the Court to order the following:

1. With the exception of medical trips, prevent Defendants from moving Plaintiff from his current institution and housing assignment;

2. Require Defendants to deliver two legal boxes to Plaintiff at his housing location for inventory, consolidation, and storage in the vault, with monthly access permitted to exchange materials with the smaller cardboard legal box kept at his bunk area;

3. Require Defendants to "restore" Plaintiff's religiously necessary Halal/Kosher diet;

1

4. Require Defendants to provide Plaintiff with a copy of any and all electronically filed documents in each and every grievance matter he has filed since his arrival at PCI;

5. Require Defendants to stop ordering Plaintiff to remove his religious headgear based on its color.

(*Id*. at 1–5).

The Motion is now ripe for resolution. (*See* Docs. 34, 46, 58).

## II.     STANDARD

"A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *ACLU v. McCreary Cty.*, 354 F.3d 438, 444 (6th Cir. 2003) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). And, in cases like this one, "where a prison inmate seeks an order enjoining state prison officials, the Court is required to proceed with the utmost care and must be cognizant of the unique nature of the prison setting." *Roden v. Floyd*, No. 2:16-CV-11208, 2018 WL 6816162, at *2–3 (E.D. Mich. Nov. 13, 2018), *report and recommendation adopted*, No. 16-11208, 2018 WL 6815620 (E.D. Mich. Dec. 27, 2018).

When considering a motion for preliminary injunction, a district court must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (citation and internal quotation marks omitted).

Under the first factor, to establish a strong likelihood of success on the merits, the movant must demonstrate "more than a mere possibility" of success. *Nken v. Holder*, 556 U.S. 418, 435 (2009). This requires, "at a minimum," a movant to show "serious questions going to the merits."

*Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (citation and internal quotation marks omitted). The first factor is often determinative:

> [C]ourts have often recognized that the first factor is traditionally of greater importance than the remaining three. *See Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537 (6th Cir. 1978). In fact, the Sixth Circuit has held that when the proponent of the injunctive relief has no chance of success on the merits of the claim, the Court may dismiss the motion without considering the other three factors. *See Michigan State AFL–CIO v. Miller,* 103 F.3d 1240, 1249 (6th Cir. 1997). Failure to do so is reversible error. *See id.; Sandison v. Michigan High School Athletic Ass'n,* 64 F.3d 1026, 1037 (6th Cir. 1995).

*Stanley v. Ohio Dep't of Rehab. & Corr.*, No. C2–02–178, 2002 WL 3140935, at *3 (S.D. Ohio August 12, 2002) (denying motion for injunctive relief after evaluation only of chance of success on the merits factor); *see also City of Pontiac Retired Employees Ass'n*, 751 F.3d at 430 ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor.").

## III. DISCUSSION

The Court considers each of Plaintiff's requests in turn.

### A. No Prison Transfer Pending Litigation

In his first request, Plaintiff seeks an order requiring Defendants "to leave Plaintiff be during the period of litigation." (Doc. 34 at 2). Plaintiff seeks to remain at his current institution, claiming that "Defendants have twice moved [him] as retaliatory punishment for attempting to enforce his rights under the U.S. Constitution." (*Id*. at 1).

As a general matter, a plaintiff "ha[s] no constitutional right to remain in a particular institution, and prison officials are afforded broad discretion in transferring inmates." *Rouse v. Caruso*, No. CIV 06-10961, 2007 WL 909583, at *5 (E.D. Mich. Mar. 23, 2007) (citation omitted) (denying request for preliminary injunction preventing plaintiffs' transfers to other prisons during pendency of litigation). It follows, then, there must be "extraordinary circumstances" for a Court

3

to find a prison transfer unconstitutional. *See Prim v. Jackson*, No. 2:14-CV-1219, 2015 WL 1647293, at *17–18 (S.D. Ohio Apr. 14, 2015), *report and recommendation adopted*, No. 2:14-CV-1219, 2015 WL 3544668 (S.D. Ohio June 4, 2015) (citing *LaFountain v. Harry*, 716 F.3d 944, 948 (6th Cir. 2013)).

Plaintiff, in requesting that the Court enjoin prison officials from transferring him, does not set forth extraordinary circumstances supporting his request. Nor does he rely on his Complaint to show such extraordinary circumstances. In fact, Plaintiff provides no evidence that his risk of transfer is imminent. Rather, he bases his request solely on the fact that he has been transferred in the past. (*See, e.g.*, Doc. 34 at 1 ("The reasons justifying this order is, as stated in the complaint, that Defendants have twice moved Plaintiff as retaliatory punishment for attempting to enforce his rights under the U.S. Constitution."); Doc. 58 at 2 (arguing that Plaintiff "has been punitively transferred twice because of his successful grievances")). These allegations of past transfers are not enough. Indeed, "it is not the purpose of a preliminary injunction to prevent such speculative behavior." *Rouse*, 2007 WL 909583, at *5; *see also Ford v. Haas*, No. CV 16-11485, 2017 WL 6460299, at *2 (E.D. Mich. July 24, 2017), *report and recommendation adopted*, No. 16-CV-11485, 2017 WL 6450602 (E.D. Mich. Dec. 18, 2017) (explaining that "at best, [plaintiff's] motion is based on unsupported speculation that he will soon be transferring to [another prison]" and therefore could not show he was in imminent danger of irreparable injury).

Accordingly, absent a showing of "extraordinary circumstances" supporting his no-transfer request, Plaintiff cannot demonstrate a strong likelihood of success on the merits. *See, e.g.*, *Prim*, 2015 WL 1647293, at *17 (finding that plaintiff had "not provided any evidence of extraordinary circumstances" and as a result, "failed to meet his burden of demonstrating a strong likelihood of success on the merits as to his claim regarding transfers between prisons"); *Rouse*, 2007 WL

909583, at *5 (explaining that "[t]he mere fact that plaintiffs' transfers may make it harder for them to prosecute this litigation is not the type of irreparable harm justifying the issuance of a preliminary injunction," and also noting that "[a]ny problems caused by the housing of plaintiffs at different institutions can be accomplished through the management of this case, and in particular the scheduling of matters before the Court") (citations omitted).

Briefly, the Court notes that the remaining factors also weigh in favor of denying Plaintiff's request for injunctive relief. Both the Ohio Department of Rehabilitation and Corrections ("ODRC") and the public have an interest in prison officials' ability to regulate the transfer of inmates between facilities. Prison officials "are in a far better position than this court is to evaluate the needs of the prison system writ large and, more specifically, the proper placement of Plaintiff within that system." *Fisher v. Caruso*, No. 06-CV-11110-DT, 2007 WL 551603, at *2–3 (E.D. Mich. Feb. 20, 2007) (denying motion for preliminary injunction regarding alleged retaliatory transfers, explaining, in part, that "the confidence of the public in the criminal justice system depends in large part upon the ability of prison officials to regulate internal matters with a free hand"); *see also Ford*, 2017 WL 6460299, at *3 (holding that "[i]ssuing a preliminary injunction prohibiting [plaintiff's] transfer to a different prison would result in harm to both the [Michigan Department of Corrections] and the public, because providing appropriate supervision of Michigan's large inmate population necessarily requires the ability to transfer prisoners between facilities when the need arises.") (citing *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997) (explaining that "problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts")).

In sum, Plaintiff has failed to satisfy his heavy burden for a preliminary injunction enjoining his transfer to another facility.

**B. Access to Legal Documents and Copies of Electronically Filed Documents**

The Court turns next to Plaintiff's requests concerning his access to legal documents. Plaintiff seeks to recover his "his legal work, files, evidentiary exhibits," which he alleges are "in the general vault at PCI." (Doc. 34 at 2.) He asserts that Defendants must deliver his legal boxes "to him at his housing location" as part of "his ongoing fight to reverse his wrongful criminal conviction." (*Id*.). Relatedly, Plaintiff seeks copies of "all electronically filed documents in each and every grievance matter filed by Plaintiff since his arrival at Pickaway Correctional Institute." (*Id*. at 3).

*i. Access to Legal Documents*

While difficult to piece together his exact claims, Plaintiff seems to be arguing that, because of prison policy, he is being denied access to the courts in violation of his constitutional rights. (*See generally* Docs. 34 at 2–4; 58 at 2–3; *id*. at 5–6). ODRC has promulgated rules and policies to manage and direct its operations, including Policy 59–LEG–01, governing inmate property. (*See* Doc. 46-4 at 4). Under this policy, ODRC permits inmates to keep legal materials within a 2.4 cubic foot locker box in their cells (the "2.4 requirement"). (*Id*., ¶ 2). Inmates may not store in their cell any additional materials that do not fit within this box. (*See id*.). Inmates, however, may request permission to store excess materials in a secure location designated by the unit's managing officer. (*Id*., ¶ 5). Inmates requesting such additional space "must first make reasonable efforts to reduce the amount of legal material in their possession", and "[a]ll excess material, including inactive case files, must be either mailed out of the institution at the inmate's expense or otherwise disposed of by the inmate." (*Id*.). At PCI, where Plaintiff is currently incarcerated, the inmate property vault is used to store excess legal material. (Doc. 46-1 at 3, ¶ 12). To view their documents in the vault, inmates must request that their unit staff call the vault officer

in advance. (*Id*.).

Plaintiff also alleges that the box containing his legal materials "had somehow been moved into a box labeled for [another inmate]" and had been missing for nearly 2 years. (Doc. 58 at 9). In his affidavit, Plaintiff claims that many of his legal materials were missing from the box, including his "most recent post-conviction filing and appeals that [he] needed to file a State Habeas Corpus," and as a result, he is "now out of time to file that action in the Ohio Supreme Court." (*Id*.; *see also id*. at 3).

Prisoners have a constitutional right of access to the courts. *See Bounds v. Smith,* 430 U.S. 817, 821 (1977). This right, however, is not limitless. Indeed, "the Sixth Circuit has explained that the constitutional right 'is not a generalized right to litigate but a carefully-bounded right.'" *Whiteside v. Collins*, No. 2:08-CV-875, 2009 WL 4281443, at *6 (S.D. Ohio Nov. 24, 2009), *report and recommendation adopted*, No. 2:08-CV-875, 2010 WL 1032424 (S.D. Ohio Mar. 17, 2010), *aff'd* (Apr. 17, 2014) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999)). Further, "[i]n order to state a viable claim for interference with his access to the courts, a plaintiff must show 'actual injury.'" *Odom v. Pheral*, No. 5:12CV-P73-R, 2012 WL 3717979, at *2 (W.D. Ky. Aug. 27, 2012) (quoting *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). "Actual injury" means that "a claim 'has been lost or rejected, or that the prescription of such a claim is currently being prevented.'" *Id*. (quoting *Lewis*, 518 U.S. 343 at 356). But "not every actual legal injury or prejudice suffered by a prisoner triggers constitutional concerns." *Thomas v. Rochell*, 47 F. App'x 315, 317 (6th Cir. 2002). Rather, "the First Amendment protects only a prisoner's access to the courts as it relates to cases which attack his convictions and sentences and to cases which challenge the conditions of his confinement." *Id*. (citing *Lewis*, 518 U.S. at 355). Finally, and especially

7

important here, the prisoner's alleged injury must have been "caused by more than mere negligence on the part of prison officials." *Whiteside*, 2009 WL 4281443, at *7.

Plaintiff's most promising "access to the courts" claim is that, because of Defendants' conduct, he missed a filing deadline with the Ohio Supreme Court. (Doc. 58 at 9, ¶ 6). But, as noted, a viable claim in this context requires Plaintiff to provide supporting facts in his Motion or to refer to facts in his Complaint showing that his injury "was caused by more than mere negligence on the part of prison officials." *Whiteside*, 2009 WL 4281443, at *7.

Plaintiff has done neither. He relies only on conclusory allegations regarding Defendants' conduct. (*See, e.g.*, Doc. 58 at 2 ("Unfortunately, defendant's flagrant conduct was not based upon any genuine concern for policy. At the time they forced plaintiff to leave one of his two legal boxes at LoCi.")). And, with regard to his claim that Defendants allegedly lost one of his boxes containing legal materials, Plaintiff does not show that Defendants' conduct was anything "more than mere negligence." *Whiteside*, 2009 WL 4281443, at *7. (*See, e.g.*, Doc. 58 at 3 ("However on March 28, 2019 officer Salyers called Mr. Tolliver to the PCI vault and informed him that somehow the contents of Plaintiff's missing box had been stored in a different box under another inmates name."; *id*. at 9, ¶ 4 (stating the same))).

Accordingly, because he has not set forth facts showing intentional conduct on behalf of Defendants, Plaintiff has not shown a strong likelihood of success on the merits. *See Whiteside*, 2009 WL 4281443, at *7 (citing *Lewis,* 518 U.S. at 349; *Simkins v. Bruce,* 406 F.3d 1239, 1242 (10th Cir.2005) ("[W]hen access to courts is impeded by mere negligence, as when legal mail is inadvertently lost or misdirected, no constitutional violation occurs.")); *Banks v. Sheldon*, No. 3:13-CV-00020, 2013 WL 1947166, at *5 (N.D. Ohio May 9, 2013) (denying plaintiff's claim that defendants failed to timely forward his mail, resulting in him missing the deadline to file his notice

of appeal to the Supreme Court of Ohio, explaining that "plaintiff has not alleged any facts demonstrating that this Defendant intentionally mishandled his legal mail or acted with the intent to impede Plaintiff's access to the courts") (citing *Sims,* 170 F. App'x at 957).

The other factors also cut against granting a preliminary injunction. Both ODRC and the public have an interest in prison administrators' freedom to promulgate rules and regulations maintaining order within the prison. "Courts must accord prison administrators 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Ciavone v. McKee*, No. 1:08CV771, 2009 WL 2096281, at *1 (W.D. Mich. July 10, 2009) (quoting *Ward v. Dyke*, 58 F.3d 271, 273 (6th Cir. 1984)). On this record, the Court will not disturb ODRC's "2.4 requirement" governing the storage of inmates' personal property. Accordingly, Plaintiff has failed to satisfy his burden supporting a preliminary injunction regarding the storage of legal material.

      ii.     *Copies of Electronically Filed Documents*

Plaintiff also wants copies of his electronically filed grievances. (*See* Doc. 58 at 6). Plaintiff states that such documents are necessary for his preparation of this case. (*See id*.). Specifically, he alleges that the requested copies "are likely to be relevant to pleadings being drafted" and "have anticipatory relevance to reply briefs." (Doc. 34 at 4). While that may be true, such allegations do not amount to a cognizable "access to the courts" claim nor do they justify the extraordinary remedy of a preliminary injunction. *See Lewis*, 518 U.S. at 354 (holding that the State is not required to "enable the prisoner to discover grievances, and to litigate effectively once in court"). Accordingly, Plaintiff has failed to meet his burden to show a substantial likelihood on the merits regarding his request for copies of his grievances.

A weighing of the other factors only further undermines Plaintiff's request. As already established, both ODRC and the public have a keen interest in ODRC's ability to effectively manage administrative and financial concerns within prison walls. At PCI, inmates are entitled to one free copy of electronically filed grievances. (Doc. 46-1, ¶ 13). "It is at the discretion of the inspector to supply copies of cases that are beyond 6 months old and do not have a pending court case attached to the reason." (*Id.*). Moreover, "cases pertaining to the inmate grievance procedure are electronic and can be viewed at the leisure of the inmate" whether the case is open or closed. (*Id.*, ¶ 14). Plaintiff responds, however, that because he does not know the individual case numbers of his previously filed grievances, he cannot request electronic copies of them. (Docs. 34 at 3–4; 58 at 3). But such an administrative issue is best left to prison officials and is not an appropriate basis for Court intervention.

Indeed, "[f]ederal courts are typically reluctant to intervene in the day-to-day operation of state prisons, even when an inmate's constitutional rights are implicated in that operation, unless the challenged prison regulation is not reasonably related to legitimate penological goals." *Carter v. Wilkinson*, No. 2:05-CV-0380, 2007 WL 2874722, at *1 (S.D. Ohio Sept. 27, 2007), *report and recommendation adopted*, No. 2:05-CV-0380, 2008 WL 5142998 (S.D. Ohio Dec. 5, 2008); *see also Ward* 58 F.3d at 273 (holding that courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

Accordingly, as to his request regarding copies of his electronically filed grievances, Plaintiff has not satisfied his burden under the stringent preliminary injunction standard.

**C. Halal/Kosher Diet**

Next, Plaintiff asks the Court to order ODRC to provide him with a Halal/Kosher diet.

(Doc. 34 at 2–3). Specifically, Plaintiff seeks an order requiring Defendants ensure he is provided with the following: 2 frozen TV style meals, on a rotating variable menu; cereal; hard boiled eggs; prepackaged muffin or cinnamon rolls; peanut butter & jelly for breakfast; and ample fresh fruit throughout the day. (*Id*. at 2).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") "provides protection for 'institutionalized persons who are unable to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion.'" *Roberts v. Schofield*, No. 3:11-1127, 2014 WL 1028427, at *2 (M.D. Tenn. Mar. 18, 2014) (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 721, (2005)). "Under RLUIPA, the inmate must present *prima facie* evidence that prison officials have substantially burdened his religious exercise." *Id*. (citing 42 U.S.C. § 2000cc–2(b)). Applying that same standard here, the Court must decide whether Plaintiff's vegetarian, rather than Halal or Kosher diet, "substantially burdens" his religious exercise.

ODRC prisons offer vegetable and non-pork meals to Muslim inmates, like Plaintiff. (Doc. 46-10 at ¶ 7). Prepackaged Kosher meals are served to inmates who have been approved by the Religious Service Administrator for religious meal accommodations. (*Id*., ¶ 9). There are currently 136 inmates with approved kosher meal accommodations. (*Id*.). Plaintiff first requested Kosher meals in 2015 and Halal meals in 2016. (*Id*., ¶ 10). Plaintiff's requests, however, were denied because "ODRC currently provides meal accommodation in the form of either non-pork or vegetarian meals for Muslims." (*Id*.).

"Federal courts have consistently recognized that a prohibition of halal meat does not amount to a substantial burden on religious exercise when vegetarian options are available." *Robinson v. Crutchfield*, No. 1:14-CV-115, 2014 WL 934548, at *2–3 (S.D. Ohio Mar. 10, 2014).

11

"While 'prison administrators must provide an adequate diet without violating the inmate's religious dietary restrictions ... [i]f the prisoner's diet ... is sufficient to sustain the prisoner in good health, no constitutional right has been violated.'" *Robinson v. Jackson*, No. 1:14-CV-115, 2014 WL 4988152, at *2 (S.D. Ohio Oct. 6, 2014), *aff'd*, 615 F. App'x 310 (6th Cir. 2015) (quoting *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010)).

Plaintiff does not allege that his diet is inadequate to sustain him in good health. Rather, Plaintiff asserts that, as a practicing "Shafi" and adherent to "Sufism," he has "additional beliefs and restrictions that are more strict than those of the Muslim groups typically found in prisons." (Doc. 58 at 10, ¶ 10).

> These core beliefs include additional animals such as frogs, crocodiles, and any creature with talons. As well as, core criterion for persons who may be permitted to prepare my food. It is not permissible for me to eat food prepared or served by pagans, wiccans, nor even atheist. The evidence of which was part of that taken from me at LOCI. It specifically explained that I cannot eat food of the "Luati" (people from the story of prophet Lot) who practice lewd and abominable sex forbidden in Islam (as between two men).

(*Id.*, ¶ 13).

Plaintiff also filed a letter, written by Lumumba K. Shakur, the "lead instructor at Tayba Foundation," which is an "educational religious organization" providing services to "incarcerated Muslims all across the United States." (Doc. 60). Mr. Shakur's letter reiterates, in detail, the same religious dietary restrictions that Plaintiff articulates in his pleadings. (*See, e.g.*, *id.* (stating that "[w]ith respect to Mr. Tolliver, he is a follower of the Shafi'i School of Jurisprudence and the Shafi'i School of Jurisprudence is the strictest in this particular matter")). However, despite his protests otherwise, Plaintiff "has no right to choose the items on his menu, including meat that is slaughtered in accordance with Islamic law." *Robinson*, 2014 WL 934548, at *2–3 (finding that "other than Plaintiff's self-serving statements, there is no evidence that the vegetarian meal, which

is halal, is not sufficient to sustain Plaintiff in good health") (citing *Spies v. Voinovich,* 173 F.3d 398, 406 (6th Cir. 1999)); *see also Adams v. Woodall*, No. 3:14-CV-00020, 2015 WL 998324, at *7 (M.D. Tenn. Mar. 5, 2015), *report and recommendation adopted*, No. 3-14-0020, 2015 WL 1549002 (M.D. Tenn. Apr. 7, 2015) (holding that "as long as a plaintiff is given an alternative to eating non-halal meat, he does not suffer a 'substantial burden' to his religious beliefs under the RLUIPA") (quotation marks and citation omitted); *Sareini v. Burnett,* No. 08–13961–BC, No. 08–13961, 2011 WL 1303399 (E.D. Mich. Mar. 31, 2011) (noting that "Plaintiff may prefer Halal meat entrees over the vegetarian and non-meat substitutes provided, but his food preferences, as a prisoner, may be limited").

As the above case law makes clear, Plaintiff has failed to show a strong likelihood of success on his religious diet claim. *See, e.g.*, *Robinson*, 615 F. App'x at 313 (holding that "vegetarian meals are, in fact, Halal" and, because plaintiff was not being denied Halal meals, he therefore failed to state a claim under RLUIPA); *Adams*, 2015 WL 998324, at *6 (holding that "[i]t is well established that Muslim prisoners do not have a right under the First Amendment or the RLUIPA to be provided halal meat entrees;" rather, a prison must not force an inmate to violate his religion) (quotation marks and citations omitted); *Hudson v. Caruso*, 748 F. Supp. 2d 721, 729–30 (W.D. Mich. 2010) (stating the same).

Briefly, the other factors also cut against a preliminary injunction. According to Kevin Stockdale, ODRC's Deputy Director of Administration, "[t]he projected annual cost of providing three Halal meals to the approximately 3,400 Muslim inmates . . . is $5,802,586 and would cause an extreme budgetary hardship at ODRC." (Doc. 46-2, ¶ 3). While Plaintiff challenges the accuracy of these numbers, (*see, e.g.*, Doc. 58 at 4–5, 10), the Court finds that both ODRC and the public's interest weighs against the granting of an injunction. As established, the Court must tread

lightly "in the context of a motion impacting on matters of prison administration," as "[a]ny interference by the federal courts in the administration of state prison matters is necessarily disruptive." *Orum v. Mich. Dep't of Corr.*, No. 2:16-CV-00109, 2019 WL 2076996, at *2–4 (W.D. Mich. Apr. 8, 2019), *report and recommendation adopted*, No. 2:16-CV-109, 2019 WL 2073955 (W.D. Mich. May 10, 2019); *see also Robinson*, 2014 WL 934548, at *6 (noting the burden on ODRC and taxpayers that would result from "forced accommodation of all Muslim inmates' requests for a halal diet that includes religiously slaughtered meat" and finding that "[s]training the budget and impinging upon prison security will not advance the public interest").

In sum, Plaintiff has not met his burden under the preliminary injunction standard, and accordingly, the Court will not grant an injunction ordering Defendants to serve Plaintiff Halal or Kosher meals.

### D. Religious Headgear

Finally, Plaintiff requests that this Court order Defendant Inspector Lawrence to honor Plaintiff's religious headgear and cease asking him for "proof of purchase" of his headgear. (*See* Docs. 34 at 4; 58 at 7). Specifically, he asserts that Defendant Inspector Lawrence is "challenging the color of [his] kufis." (Doc. 58 at 7).

In accordance with ODRC policy, inmates are permitted to wear a "white or beige kufi." (Doc. 46-1, ¶ 15 (citing ODRC policy 61-PRP-01 ("Inmate Personal Property") and ODRC policy 72-REG-12 ("Muslim Religious Practices"))). Inmates, like Plaintiff, incarcerated prior to November 7, 2007, are "grandfathered in to maintain their current head covering color." (*Id*. at 5 (the Grandfather Memorandum)). Also, under prison policy, "[i]nmates may be required to provide proof of ownership for any item of their personal property at any time." (*Id*. at 3, ¶ 16 (citing ODRC Policy 61-PRP-01)).

14

According to her sworn affidavit, Inspector Lawrence met with Plaintiff regarding the color of his kufi. (*Id.*, ¶ 17). At their meeting, Plaintiff requested that his non-white or beige kufis be deemed "grandfather property," and Inspector Lawrence "requested [Plaintiff] to provide proof of ownership in the form of a receipt prior to November 1, 2007, as proof of purchase in accordance to the ["Grandfather Memorandum"]." (*Id.*). Plaintiff maintains that, by requiring him to abide by ODRC policy regarding religious headgear, Inspector Lawrence is religiously "targeting" him. (Doc. 34 at 4).

As a threshold issue, and as Defendants note, Plaintiff's Amended Complaint is silent on the issue of religious headgear. (*See generally* Doc. 30) "A court may not grant a preliminary injunction when the issues raised in the motion are entirely different from those raised in the complaint." *Frost v. Stalnaker,* No. 1:09–cv–662, 2009 WL 3873666, at *2 (S.D. Ohio Nov.18, 2009) (citations omitted); *see also Worth v. Wamsley*, No. 2:17-CV-00043, 2018 WL 1315017, at *3 (S.D. Ohio Mar. 14, 2018), *appeal dismissed*, No. 18-3300, 2018 WL 7959120 (6th Cir. July 2, 2018) (holding that "[i]f a party fails to establish a relationship between the requested relief in the preliminary injunction and the conduct alleged in the compliant, the Court may deny the motion") (citation omitted).

In his reply brief, Plaintiff responds that the Grandfather Memorandum and its interpretation is "at the heart" of his RLUIPA claim. (Doc. 58 at 7). Plaintiff's conclusory statement linking his new claim regarding his kufi to his Amended Complaint is not well taken. Plaintiff may not use his preliminary injunction motion as an extra bite at the apple to argue new claims not before this Court. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). Accordingly, a motion for a preliminary injunction should be denied if

15

the movant cannot "demonstrate that the relief sought is related to the injury" alleged in the complaint. *Moody v. Bell,* No. 1:08–CV–796, 2009 WL 3011505, *4 (S.D. Ohio June 26, 2009) (citation omitted); *see also Atakpu v. Lawson,* No. 1:05–CV–00524, 2006 WL 3803193, *2 (S.D. Ohio 2006) (holding that plaintiff's motion for a preliminary injunction was properly denied where plaintiff had failed to "establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint") (internal quotation marks omitted).

Even assuming, *arguendo*, that Plaintiff's claim concerning his kufi relates to the RLUIPA claims in his Complaint, Plaintiff has still not satisfied his burden under the preliminary injunction standard. First, Plaintiff has not shown a likelihood of success on the merits because he has not shown that ODRC's policy concerning religious headgear substantially burdens his religious exercise. *See* 42 U.S.C. § 2000cc–2(b). This Court addressed a similar situation in *Moore v. Cruse*. There, the Court held that a prisoner's constitutional rights were not violated by being required "'to have paperwork'" for his kufi. No. 2:12-CV-609, 2013 WL 6578935, at *5 (S.D. Ohio Dec. 16, 2013), *report and recommendation adopted*, No. 2:12-CV-609, 2014 WL 878864 (S.D. Ohio Mar. 5, 2014). The Court explained:

> In the case presently before the court, Defendants' actions did not unconstitutionally infringe Plaintiff's free exercise of religion. Significantly, Defendant Cruse did not prohibit Plaintiff from all use of religious headgear; rather, Defendant Cruse informed Plaintiff that "in order to wear religious headgear in the gym he must provide the proper religious affiliation paperwork." *Declaration of Brent Cruse,* ¶ 6. This requirement did not substantially burden Plaintiff's freedom to wear the religious headgear. *See Treesh v. Bobb–Itt,* No. 2:10–cv–211, 2011 WL 3837099, at *4 (S.D. Ohio Aug. 29, 2011). A prison regulation requiring paperwork for religious headgear is reasonably related to legitimate penological interests. *See Weinberger,* 2009 WL 331632, at *4. "The needs of the institution and penological objectives must be balanced against the right of the individual prisoner." *Jihaad v. O'Brien,* 645 F.2d 556, 564 (6th Cir. 1981). Allowing inmates to wear religious headgear in areas outside their cells and during activities other than religious services "conceivably could undermine the [prison's] legitimate penological interests, primarily its overriding concern for prison security." *Muhammad v. Lynaugh,* 966 F.2d 901, 903 (5th Cir. 1992) (holding that "prison

> regulations restricting the use of Kufi caps and religious insignia bore reasonable relationship to legitimate penological interest of prison security.").

*Id*. at *6.

The Court reaches the same conclusion here and does not find that ODRC's policy concerning religious headgear substantially burdens Plaintiff's exercise of his religion. *See also Heyward v. Cooper*, No. 3:16-CV-2774, 2019 WL 1428341, at *5 (N.D. Ohio Mar. 29, 2019) ("[plaintiff] fails to allege how his rights are substantially burdened by the ODRC's requirement that he wear a white and beige kufi instead of a multi-colored one"); *Adams*, 2015 WL 998324, at *5–6 (upholding prison policy that prisoners purchase more expensive religious oils from prison union supply instead of other, less expensive vendors).

Plaintiff emphasizes that a receipt showing proof of ownership of his kufi "would only indicate a kufi was purchased, but it could not prove it was the same kufi." (Doc. 58 at 7). These are precisely the type of issues to which the Court will defer to the expertise and experience of prison administrators. *See Moore*, 2013 WL 6578935, at *6 (finding that policy regarding religious headgear was reasonably related to penological interests); *Roden*, 2018 WL 6816162, at * 3 (noting that "[c]orrectional officials are professional experts in matters of security and discipline; as such, they are better suited to make decisions about security and discipline than are the courts" (citing *McKune v. Lile*, 536 U.S. 24, 37 (2002) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. To respect these imperatives, courts must exercise restraint in supervising the minutiae of prison life.") (quotation marks and citation omitted))). Accordingly, Plaintiff's final request for a preliminary injunction fails.

At base, "[a] preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *McCreary Cty.*, 354 F.3d at 444 (quoting *Hanson Trust PLC*, 781 F.2d at 273). Moreover, in a case like this one, where a prisoner seeks an order enjoining state prison officials, the Court must "proceed with the utmost care and must be cognizant of the unique nature of the prison setting." *Roden*, 2018 WL 681612, at *3. Plaintiff has not satisfied his burden to show that such an extraordinary remedy is appropriate. Accordingly, the Court will not grant a preliminary injunction here.

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff's Motion (Doc. 34) be **DENIED**. Defendant is **DIRECTED** to respond to Plaintiff's Offer of Settlement (Doc. 59) within 14 days of the date of this Report and Recommendation. Defendant may file a notice with the Court indicating compliance with this directive but need not file the response on the public docket.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: June 21, 2019                                        /s/ Kimberly A. Jolson
                                                          KIMBERLY A. JOLSON
                                                          UNITED STATES MAGISTRATE JUDGE