IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KEVIN A. TOLLIVER,

        Plaintiff,

   v.                                   Civil Action 2:16-cv-1020
                                       Judge Edmund A. Sargus
                                       Magistrate Judge Jolson

WARDEN NOBLE, et al.,

        Defendants.

### REPORT AND RECOMMENDATION AND ORDER

This matter is before the Court on the Defendant Abdul Rahman Shahid's Motion for Leave to File Summary Judgment (Doc. 187) and Motion for Summary Judgment (Docs. 188, 190). For the reasons that follow, Defendant's Motion for Leave to File Summary Judgment (Doc. 187) is **GRANTED**. It is **RECOMMENDED** that Defendant's Motion for Summary Judgment (Docs. 188, 190) be **DENIED**.

**I.    BACKGROUND**

The Court previously summarized the allegations from Plaintiff's Amended Complaint:

Plaintiff is an inmate at Grafton Correctional Institution, who has previously been incarcerated at London Correction[al] Institution ("LoCI"), Madison Correctional Institution ("MaCI"), Belmont Correctional Institution ("BeCI"), Ross Correctional Institution ("RCI"), and Pickaway Correctional Institution ("PCI"). (Doc. 30, ¶ 7). Defendants are numerous Ohio Department of Rehabilitation and Corrections ("ODRC") employees and contractors. (*Id.*, ¶¶ 8–11).

In 2012, ODRC transferred Plaintiff to MaCI. (*Id.*, ¶ 16). While at MaCI, Defendant Abdul Rahman Shahid was an ODRC contractor who served as an Islamic Services Provider. (*Id.*, ¶ 19). Defendant Sunni[-]Ali Islam served in the same role at PCI. (*Id.*). Plaintiff alleges that Defendants Shahid and Islam (the "Defendant Contractors") generally discriminated against Muslim inmates that were not supporters of the Nation of Islam. (*See, e.g., id.*, ¶¶ 19–30). While at MaCI, Plaintiff allegedly complained to unidentified ODRC administrators and staff about the Defendant Contractors' behavior, which he asserts resulted in

> retaliation in the form of denied grievances, denied medical treatment, and limited program opportunities. (*Id.*, ¶ 35).
>
> After several years at MaCI, in 2016, ODRC transferred Plaintiff to LoCI "for programming consistent with his parole board and re-entry plan." (*Id.*, ¶ 40). Defendant Shahid served as the Islamic Services Provider at LoCI as well. (*Id.*, ¶ 43). According to Plaintiff, unidentified ODRC administrators and employees employed Defendant Contractors knowing that it would suppress Muslim inmates' religious exercise and conserve resources for Christian inmates. (*Id.*, ¶ 50). And Plaintiff takes issue with ODRC's policies which he maintains do not adequately distinguish between different sects of Islam, resulting in the discriminatory actions of Defendant Contractors. (*Id.*, ¶¶ 54–57).
>
> In September 2016, Defendants [Crisler] and [Sabulsky] "shook down Plaintiff" and conducted a search of Plaintiff's belongings. (*Id.*, ¶ 88). Plaintiff subsequently reported to the investigators who placed him in segregated housing. (*Id.*, ¶ 90). After two weeks in "maximum security isolation," Defendant [Sabulsky] informed Plaintiff of the results of his investigation. (*Id.*, ¶ 90). The investigation began based on Defendant Shahid's allegation that Plaintiff was trying to radicalize other Muslim inmates; Defendant [Sabulsky] found no evidence to support that allegation. (*Id.*). Plaintiff alleges that unidentified Defendants subjected him to more than 50 days "in isolation as punishment for his use of the grievance process." (*Id.*, ¶ 94). . . .
>
> The next month, unidentified Defendants allegedly arranged Plaintiff's transfer to PCI to impose "additional hardships" on Plaintiff, knowing that Defendant Islam worked at PCI and would continue to harass Plaintiff as Defendant Shahid had. (*Id.*, ¶ 99). . . .

(Doc. 86 at 1–3).

The Court previously dismissed several Defendants from the case and narrowed Plaintiff's allegations to First Amendment retaliation claims against four Defendants. (Docs. 117, 149). Three of the four Defendants then had summary judgment granted in their favor. (Doc. 183). Defendant Shahid, having failed to move for summary judgment by the dispositive motion deadline, later secured representation (Doc. 186), and now brings a Motion for Leave to File Summary Judgment (Doc. 187) and Motion for Summary Judgment (Docs. 188, 190). Plaintiff has opposed both Motions (Docs. 203, 204), to which Defendant did not reply. The Motions are fully briefed and ripe for consideration.

2

## II. STANDARD

Summary judgment is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Evidence is viewed in the light most favorable to the nonmoving party, meaning that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004), *citing Liberty Lobby*, 477 U.S. at 251–52, and *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994). Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

## III. DISCUSSION

### A. Motion for Leave to File

As a threshold matter, the Undersigned must decide whether to allow the filing of Defendant's Motion for Summary Judgment out of time. Defendant brought his Motion for Leave to File Summary Judgment (Doc. 187) on April 14, 2022. The dispositive motion deadline was

September 20, 2021. (Doc. 149). Plaintiff has opposed the Motion. (Doc. 203).

In essence, Defendant requests a modification of the scheduling order. Under Federal Rule of Civil Procedure 16, a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4); *see also Kirby v. Diversified Fabrications, Inc.*, No. 1:08-CV-83, 2010 WL 11520004 (E.D. Tenn. Mar. 26, 2010). The Undersigned finds that good cause supports the modification of the scheduling order here. After the other dispositive motions in the case were resolved, Plaintiff and Defendant came before the Court for a status conference. (Doc. 184). At that conference, Defendant represented that he had misunderstood his obligations in responding to Plaintiff's claims, and the Court subsequently afforded him time to secure representation (Doc. 185), which he did (Doc. 186). Now that Defendant is aware of his opportunity to move for summary judgment, and has counsel to assist him in doing so, good cause supports allowing the late filing of his Motion. Namely, modification allows consideration of Plaintiff's claim on its merits, and because Plaintiff has responded to the Motion for Summary Judgment, he will not be prejudiced by such modification.

Accordingly, Defendant's Motion for Leave to File Summary Judgment (Doc. 187) is **GRANTED**.

B. *Motion for Summary Judgment*

The only remaining claim against Defendant is for alleged retaliation in violation of Plaintiff's First Amendment rights. Defendant maintains that he "only recalls one interaction with Plaintiff and otherwise had nothing to do with him and any discipline measures he may have undergone." (Doc. 188 at 2).[1] This, he says, is supported not only by his affidavit, but also the

---

[1] The Undersigned makes citation to Defendant's first-filed Motion for Summary Judgment (Doc. 188). After the Clerk of Court issued a notice asking Defendant to refile the Motion as a text-searchable document (Doc. 189), he filed a second version of the Motion (Doc. 190). Rather than merely being a text-searchable copy of the first Motion,

4

other evidence already filed in this action. (*Id.*). The Undersigned disagrees. Rather, the evidence submitted by other Defendants in this action suggests that Defendant Shahid was critically involved in the chain of events that led to Plaintiff being placed in administrative segregation.

Investigator Sean Sabulsky attests that on or shortly before September 6, 2016, Defendant Shahid approached him and informed him that he had concerns about Plaintiff because the two had "clashed at a previous institution over religious matters and the manner in which the Imam was providing services for Muslim inmates." (Doc. 154-1, ¶ 6). He further says that Defendant Shahid planned to complete a nexus form regarding Plaintiff, which "is a document completed by prison staff or contractors to request the transfer of an inmate for, among other reasons, personal conflicts between a staff member(s) and an inmate." (*Id.*, ¶ 7). According to Sabulsky, Plaintiff's placement in administrative segregation followed then as a matter of course: "It is standard procedure for an inmate to remain in segregated housing when a nexus is completed due to a staff/inmate conflict until either the conflict is resolved or the inmate is transferred to another institution." (*Id.*, ¶ 12). The Warden of LoCI then purportedly submitted a request to transfer Plaintiff to a different institution "to separate him from Imam Shahid[,]" and such transfer was completed on October 25, 2015. (*Id.*, ¶¶ 13–14). These facts were all affirmed by Investigator Matthew Crisler. (Doc. 154-2, ¶¶ 6, 7, 12, 13–14).

The investigators' representations simply do not square with Defendant's account that he "was not involved in any way with Plaintiff's discipline[,]" and "not involved with the handling or as a witness relating to any of the prison disciple [sic] or other matters relating to Plaintiff." (Doc. 188-1, ¶ 6). Nor does Defendant identify any evidence in the record (aside from his own affidavit) that supports his account. At base, the evidence adduced by Defendant is insufficient

---

the content of that Motion is distinct. However, given that the second version refers to only a dismissed Defendant and a dismissed claim (*see* Doc. 190), the Undersigned considers it a mistaken filing—and, in any instance, immaterial.

for the Court to find, for the purposes of summary judgment, that he was not involved in the act of retaliation alleged by Plaintiff.

Defendant undertakes no consideration of the elements of the retaliation claim, and therefore has not argued that there is insufficient evidence to support any element of Plaintiff's claim. (*See* Doc. 188). Briefly, the Undersigned considers the evidence supporting the elements of Plaintiff's claim. A First Amendment retaliation claim has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

First, Plaintiff clearly engaged in protected conduct. His use of the grievance process to lodge complaints against Defendant is well documented. (Doc. 161 at 30–32; Doc. 161-1 at 1–3). And "a prisoner has a First Amendment right to file grievances against prison officials," so long as he is not utilizing the grievance system to violate a legitimate prison regulation. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).

Second, the record sufficiently supports that adverse action was taken against Plaintiff. Plaintiff alleges he was placed in administrative segregation following Defendant's report. (Doc. 30, ¶¶ 89, 91, 94, 98–99). "In the prison context, an action comparable to transfer to administrative segregation would certainly be adverse." *Thaddeus-X*, 175 F.3d at 396; *see also Hill v. Lapin*, 630 F.3d 468, 474 (6th Cir. 2010) ("This court has held that restricting a prisoner's housing by placing him in administrative segregation constitutes an adverse action."). The record suggests that Plaintiff went into administrative segregation on September 6, 2016, in response to Defendant's

6

reported conflicts.  (Doc. 154-1, ¶ 12; Doc. 154-2, ¶ 12; Doc. 154-3 at 1).  Plaintiff remained in segregated housing until his transfer to PCI, on October 25, 2016.  (Doc. 154-1, ¶ 14; Doc. 154-2, ¶ 16; Doc. 154-5 at 13–14).

Finally, Plaintiff must demonstrate that his segregation was motivated at least in part by his use of the grievance system.  In Plaintiff's rendering of the events, it was.  He purports that Defendant filed the nexus form with the intention to retaliate against him for his earlier use of the grievance system to complain about Defendant's religious services, and that Defendant knew the filing of the nexus form would lead to Plaintiff's segregation and potential transfer.  (*See, e.g.,* Doc. 154-6 at 40) (Plaintiff describing that he was "placed in segregated housing under investigation upon an allegation from Abdul Rahman Shahid[,]" and that the at-issue "[s]taff nexus was an abuse of process that violated [his] [F]irst [A]mendment right to redress grievances . . . .").

Though Defendant did not personally confine Plaintiff in administrative segregation (the investigators did), "protected speech causes an adverse action if the speech motivates an individual actor to take acts that then proximately cause an adverse action."  *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012).  In other words, Plaintiff "must show both (1) that the adverse action was proximately caused by an individual defendant's acts, but also (2) that the individual taking those acts was motivated in substantial part by a desire to punish an individual for exercise of a constitutional right[.]"  *Id.* (citations and quotation marks omitted).

Defendant seemingly challenged the first of these prongs, proximate cause, with his blanket assertion that he had nothing to do with Plaintiff's discipline.  (Doc. 188 at 2).  Yet, as highlighted above, the evidence submitted by the investigators suggests that Defendant's report of conflicts with Plaintiff and his stated intention to file a nexus form set in motion a chain of events in which Plaintiff's placement in administrative segregation was not only a foreseeable consequence, but

7

one required by ODRC policy. (*See* Docs. 154-1, 154-2). Defendant does not rebut the investigators' testimony. Thus, it is reasonable to conclude that Defendant "set[ ] in motion an adverse action" which was "the reasonably foreseeable consequence[ ] of his actions." *King*, 680 F.3d at 695.

Plaintiff further adduced evidence supporting the second retaliatory motive prong of causation. First, he alleges Defendant made comments which evince retaliatory intent. (Doc. 161 at 31–32) (2014 grievances in which Plaintiff purports that Defendant said "All you snitches keep my name out your mouth and off your paperwork[,]" and "My friend . . . suggested I start pushing my own paper against those of you who put paper on me . . . ."); (Doc. 30, ¶¶ 78–79) (alleging threatening comments made by Defendant in 2016 at LoCI, including, "For those of you who think you know how to get rid of me, wait and see how I know how to get rid of you."). Additionally, Plaintiff submitted affidavits from several individuals who corroborate Defendant's retaliatory motivation. Particularly, Romel Williams says he experienced the same pattern of retaliation from Defendant. (Doc. 161 at 29). Like Plaintiff, he says he filed grievances against Defendant while incarcerated at MaCI and encountered Defendant later at LoCI. (*Id.*). Defendant then purportedly made retaliatory false charges against Mr. Williams, which led to his segregation and eventual transfer. (*Id.*). Two other witnesses, Joshua Woods and Michah Wright, who spent time incarcerated with Plaintiff and Mr. Williams, say they can support these instances of retaliation. (Doc. 161 at 27–28). Defendant has made no attempt to rebut the witness statements or Plaintiff's allegations about Defendant's own remarks.

To be clear, the Undersigned makes no suggestion that Plaintiff has adduced evidence sufficient to ultimately prevail on his claim of retaliation. But, viewing the evidence in a light most favorable to Plaintiff, and given that Defendant has not meaningfully produced

8

counchtervailing evidence, the Undersigned must conclude that Defendant is not entitled to summary judgment. Defendant has simply not made a showing that Plaintiff's evidence is insufficient regarding any element of the retaliation claim. Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment (Docs. 188, 190) be **DENIED**.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Leave to File Summary Judgment (Doc. 187) is **GRANTED**. It is **RECOMMENDED** that Defendant's Motion for Summary Judgment (Docs. 188, 190) be **DENIED**.

### V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: September 20, 2022                              /s/ Kimberly A. Jolson
                                                                           KIMBERLY A. JOLSON
                                                                           UNITED STATES MAGISTRATE JUDGE